### J. P. (BUM) GIBBINS, Inc. v. UTAH HOME FIRE INS. CO. et al.
#### No. 4526.

United States Court of Appeals,
Tenth Circuit.

Feb. 5, 1953.

Rehearing Denied March 11, 1953.

Eugene C. Paine, Albuquerque, N. M. (Luther Bohanon, Lynn Adams and Reese, McCormick, Lusk & Paine, Carlsbad, N. M., on the brief), for appellant.

William W. Gilbert, Santa Fe, N. M. (Carl H. Gilbert and L. C. White, Santa Fe, N. M., on the brief), for appellees.

Before PHILLIPS, Chief Judge, and BRATTON and PICKETT, Circuit Judges.

PICKETT, Circuit Judge.

The Utah Home Fire Insurance Company and Edward W. Cannedy brought this action to recover damages caused by the collapse or the pulling-in of an oil and gas well drilling rig while being used by the defendant. In their first cause of action, plaintiffs alleged that Cannedy was the owner of a Cardwell Trailerig for drilling oil and gas wells, serial number TRW-KW-58, together with full equipment and ac-cessories appurtenant thereto; that the insurance company had in force a collapse and pull-in $500.00 deductible insurance policy with a loss payable clause to Cardwell Manufacturing Company, Inc.; that the defendant took possession of the rig and negligently set up, used and operated it, as a result of which the rig upset, collapsed and was pulled-in and damaged; and that the insurance company became obligated to pay such damages in accordance with the terms of the policy. In a second cause of action Cannedy sought to recover a reasonable rental for nineteen days' use of the rig.

The defendant answered denying the negligence and denying that Cannedy was the owner of the rig and that the insurance company was obligated to pay Cannedy the amount of the loss. Defendant admitted that it took possession of the rig and used the same but denied any agreement with Cannedy to purchase or pay rental for the use of the rig, and alleged that it possessed and used the equipment under an agreement with Cardwell. As a further defense, defendant alleged that Cannedy purchased the rig under a conditional sales contract from Cardwell which provided that Cardwell should retain title to it with the right upon default to repossess and cancel the contract; that Cannedy defaulted in the payments provided for in the conditional sales contract and Cardwell had cancelled the contract and took possession of the rig; that after the repossession, defendant, by oral agreement, purchased the rig from Cardwell and took possession of it and moved it upon a location; that it was then discovered that the rig was not suitable for use by the defendant and was not as represented; and that upon notification, Cardwell then agreed that the defendant should continue to use the rig on the location until the work was completed under a profit sharing arrangement.

Upon trial to the court without a jury the issues were found generally in favor of the plaintiffs and judgment, including interest, entered accordingly.

The facts are not in substantial dispute. Cardwell Manufacturing Company, Inc., of Wichita, Kansas, is the manufacturer of a

complete portable oil and gas well drilling rig which is mounted upon a truck trailer. The derrick is of tubular construction which telescopes and folds down over the truck for moving. When the rig is to be used, the derrick is erected by use of the motor power on the trailer. In proper position the derrick is not directly over the well hole as is the conventional derrick but leans out from the trailer approximately ten degrees so that its top is directly over the well hole. The working table which extends from the rear of the trailer is supported on the ground with legs. Guy wires are connected from the derrick to the trailer. The front end of the trailer is anchored with heavy steel cable to deadmen buried on either side and directly in front. The purpose of these deadmen is to prevent the trailer from moving sidewise and from lifting up when weight is applied to the derrick.

On September 30, 1949, Cannedy purchased from Cardwell the unit in question under installment payment conditional sales contract. As additional security for the performance of the contract, another rig and equipment was included. Cannedy was unable to meet the installment payments and Cardwell made demand for payment. It was then suggested that the two rigs be sold and the purchase price applied on Cannedy's account. Cardwell agreed to assist in this sale but the rigs were not to be sold unless Cannedy agreed upon the purchase price. Cannedy retained possession and continued to use the rigs. A representative of Cardwell negotiated the sale to the defendant and Cannedy delivered the rig in question to it. Cardwell furnished a representative to assist the defendant in setting up the rig for use on location. The three deadmen were installed on the front end of the trailer, but there was evidence that two of them were not of the size or buried to the depth that they should have been.

The defendant was using the rig to work over an old well. On January 18, 1951, the drill pipe stuck in the hole, and the day crew operating the rig was able to loosen it by the application of weight on the derrick and by circulating fluid through the drill pipe. The driller in charge at that time knew that if the trailer was not properly tied down it would lift up with a heavy pull. During this operation a helper was designated to watch the front end. Later the drill pipe again stuck, and the night crew attempted to loosen it, but when heavy weight was applied to the derrick, the trailer began to lift. The driller sent helpers to tighten the cables running to the deadmen. As greater weight was then applied to the derrick, the front end of the trailer was lifted higher. The driller raced the motors and continued to work with the pipe.[1] The two side deadmen pulled loose from the

1. One of the helpers on the job testified:
"Q. When did you go on tour?—A. I went on tour at four o'clock in the evening.

"Q. Had you had any difficulty with guy wires or dead men prior to the time it pulled in on this particular tour?—A. Yes, sir.

"Q. Just tell the Court what happened.—A. Well, we were—had the pipe stuck in the hole, and tried pulling on it and circulating and reverse circulating working with the pipe trying to get it loose. And had a lot of trouble with the mud pump, and had to work it over to get it running. The driller was pulling on this.

"Q. This stuck pipe?—A. This stuck pipe. And it seemed like the back end was getting light. It seemed like it was raising up a little bit in the back. So he had us to check our guy lines. And we checked the back guy lines and tightened them down.

"Q. Were they loose?—A. They were loose. We tightened the guy lines down, and returned to the dog house. And when I started into the dog house, I met him, and he was going up on the floor.

"Q. Who was 'him'?—A. Mr. Spears.

"Q. The driller?—A. It was down about zero weather, and our hands was froze from tightening the guy lines, and we went in to warm our hands. And while we were warming our hands, Mr. Spears went up on the rig and raced his motors up and started working with the pipe. And this back end of the rig started—.

"Q. Did you go out of the dog house?—A. Yes, sir.

"Q. Could you see the rig?—A. Yes, sir.

"Q. Describe what you saw.—A. The back end of the rig started raising up a

ground and the cable on the third gave way. The evidence showed that if the motors had then been shut off and the weight on the derrick discontinued, the trailer and derrick would have returned to their normal position. After the trailer was about eighteen feet off the ground the driller shut off the motors, but the derrick continued to tip until it collapsed causing the damage in question.

The defendant first contends that the Cardwell Manufacturing Company, Inc. was the real party plaintiff, and that Cannedy had no interest. The trial court found that Cannedy was the equitable owner of the property and was entitled to maintain the action. The evidence is clear that Cardwell did not exercise its rights under the conditional sales contract by taking possession of the rig and canceling out Cannedy's interest therein.[2] According to the evidence Cardwell did no more than agree to assist Cannedy in disposing of one or two rigs for the purpose of eliminating the

"little bit, and before we could holler, run or anything else, Mr. Spears started off, and then back, and it was still coming up—.

"Q. And the motors still running?—A. And the motors were still running. And Mr. Spears turned around and went back toward the draw works, and by that time the back end of the rig was somewhere between twelve and fourteen feet in the air. I believe you call it the front end of it.

"Q. You mean the end of the rig that has the motors on it away from the mast?—A. Yes, sir. Somewhere between twelve and fourteen feet in the air. And that was all we could see because the light cord pulled loose from the light plant, and the lights went.

"Q. Was it about that time it crashed?—A. Yes, sir.

"Q. Now, when the rear end of the rig pulled up around fifteen feet in the air, the last you saw it, was it the entire trailer that was pulling up, Mr. Prestridge, or what was it?—A. The trailer was pulling up, but the ramp was setting down.

"Q. The end of the trailer that is farthest from the mast was coming right up in the air?—A. Yes, sir."

* * * * * * *

"Q. I see. You had been on this rig throughout its operation in that particular location, had you not?—A. Yes, sir.

"Q. Was this the first time any pipe had been stuck in the hole?—A. The first we had had on our tour. I don't know whether the others had any or not.

"Q. When the pipe gets stuck in the hole, do they put a large amount of pressure?—A. Some.

"Q. On the draw works and the derrick to try and loosen it?—A. Sometimes they try to pull on it. It doesn't do too much good to pull on it.

"Q. Had he been pulling on it on that tour?—A. Yes, sir.

"Q. Was he doing so at the time the derrick pulled in?—A. I guess he was.

"Q. The pipe had not been loosened at that time?—A. No, sir.

"Q. And you know the motors were pulling on something?—A. Yes, sir.

"Q. And do you know whether the line was connected to that pipe or not?—A. Yes, sir."

2. In case of default the conditional sales contract provided that Cardwell should have certain remedies including:

"Second: It may, without demand or performance or notice, retake possession of said property and may, at public or private sale, with or without notice, with or without having the property at the place of sale, and upon such terms and in such manner as it may determine, sell the said property (seller being permitted to bid at any public sale) and after deducting all expenses (including reasonable attorney's fees) incurred therein credit the net proceeds of the sale to the unpaid balance due hereunder; any surplus shall be paid to buyer; and buyer agrees to pay to seller any deficiency remaining under this contract or under said promissory notes after such resale is completed and the proceeds applied as herein provided; or,

"Third: It may take possession of said property wherever and whenever found, and, with or without notice or demand, may elect to treat buyer in default, and in such event all of the rights, titles, and equities of buyer in said property shall immediately cease and determine, and seller shall be released from all obligations to transfer or deliver said property to the buyer, and all sums of money theretofore paid, and all sums then due and unpaid by the buyer to seller hereunder or under said promissory notes shall remain the property of seller and shall be considered compensation for the use, wear and tear and depreciation of said property, and buyer agrees forthwith to pay to seller all of said payments which are then due and unpaid; or,"

delinquencies on the conditional sales contract. Cardwell did not take possession of the rigs nor did it take any steps toward foreclosing upon them. No sale was to be made without the consent of Cannedy. The evidence sustains the conclusion that Cannedy was the equitable owner of the rig under the conditional sales contract and that he was entitled to the use and possession of the same. The authorities are uniform that a person in such a position may sue in his own name for the value of the personal property damaged or destroyed. The right is similar to that of a bailee. 47 Am.Jur., Sales, Sec. 879; 78 C.J.S., Sales, § 632; Queenan v. Mays, 10 Cir., 90 F.2d 525, certiorari denied Board of County Com'rs v. Mays, 302 U.S. 724, 58 S.Ct. 45, 82 L.Ed. 559; Yrisarri v. Clifford, 32 N.M. 1, 249 P. 1011; Harris v. Seaboard Air Line R. Co., 190 N.C. 480, 130 S.E. 319, 49 A.L.R. 1452; Anno. 38 A.L.R. 1337.

There is no merit to defendant's contention that the insurance policy was not in effect. After Cannedy had been notified that the rig had been sold to the defendant, he notified the insurance company to cancel the policy. Under its provisions, the policy could not be cancelled without the consent of Cardwell. When Cardwell was informed that the defendant would not purchase the rig, the insurance company was notified that the sale to the defendant had not been consummated and that the coverage should remain in effect. The insurance company recognized its liability under the policy and upon payment of the claim became subrogated to the rights of Cannedy to the extent of its payment and was a proper party along with Cannedy to recover the total loss. United States v. Aetna Casualty & Surety Co., 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171, 12 A.L.R.2d 444.

Defendant contends that the evidence is insufficient to sustain the finding that the defendant negligently and carelessly used and operated the rig, and that as a proximate cause thereof the rig was pulled in, upset and collapsed. We have recited herein the facts surrounding the pulling in and collapse of the rig. We think it sufficient to say, without further review, that the evidence is sufficient to sustain the finding. The defendant says that the collapse of the rig was not due to negligence but "from a review of all the evidence it is apparent that something went wrong with the controls." The trial court did not so find and it is not our function to determine what the facts are or to determine conflicts in evidence. We must accept the findings unless clearly erroneous. Fed.Rules Civ. Proc. rule 52(a), 28 U.S.C.A.; United States v. National Ass'n of Real Estate Boards, 339 U.S. 485, 70 S.Ct. 711, 94 L.Ed. 1007; American Home Fire Assurance Co. v. Mid-West Enterprise Co., 10 Cir., 189 F.2d 528; Carnes v. United States, 10 Cir., 186 F.2d 648.

Finally, it is urged that the trial court erred in allowing interest upon the judgment prior to the date thereof. The trial court found that: "The amount of the loss and damage caused by the pull-in, upset and collapse of said rig was ascertainable with reasonable accuracy promptly upon the pull-in and collapse thereof." In New Mexico the allowance of interest is essential to just compensation for damages. If the amount of unliquidated claims may be determined with reasonable accuracy, interest may be allowed. Sundt v. Tobin Quarries, Inc., 50 N.M. 254, 175 P.2d 684, 169 A.L.R. 586; State Trust & Savings Bank v. Hermosa Land & Cattle Co., 30 N.M. 566, 240 P. 469; Cases collected, 96 A.L.R. 18, 111 A.L.R. 1299. There was no particular difficulty in determining immediately and with reasonable certainty the amount of the loss caused by the collapse of the rig. This is illustrated by the nature of the evidence relating to the cost of replacement or repair of the rig. It is conceded that if Cannedy may maintain this action he should recover a reasonable rental for the use of the rig which the court found to be $280.00 per day. Clearly, interest is allowable upon this amount.

Judgment is affirmed.

On Petition for Rehearing.

On petition for rehearing it is insisted that there was insufficient evidence to sustain the trial court's finding that "the defendant negligently and carelessly used

and operated said rig and as a proximate result thereof said rig was pulled in, upset and collapsed."

It is said that in the oil industry the terms "pulled in," "upset," and "collapsed" have distinctly different meanings and that such different meanings have significance here. During the trial of the case and on appeal no distinction was made in the meaning of these terms and apparently they were used synonymously. We sustained the finding of negligence and affirmed the judgment on the evidence of record that the rig was upset and damaged by the negligent operation of the defendant. This was the sole basis of our affirmance and we adhere to that view. If, as defendant now insists, the terms "pulled in" and "collapsed" have distinct and different meanings from "upset" or "turned over" and that such meanings are of any importance here, there is no evidence to support the finding of the court in that respect. If this was error, it was harmless. The derrick and the trailer which carried it was a unit and when the derrick was erected it stood at approximately right angle with the trailer. When the derrick tipped it necessarily lifted one end of the trailer. The evidence is without substantial conflict that the derrick was "upset" or "tipped over" and damaged by continuous application of excessive weight at its top. The upsetting or overturning of the rig was included within the finding of the court.

The petition for rehearing is denied.