**AMERADA PETROLEUM CORPORATION, a corporation, Appellant,**

v.

**John L. BURLINE, Appellee.**

**No. 5152.**

United States Court of Appeals
Tenth Circuit.

March 13, 1956.

Garrett Logan, Tulsa, Okl. (Villard Martin, Tulsa, Okl., on the brief), for appellant.

Robert D. Hudson, Tulsa, Okl., for appellee.

Before PHILLIPS, Chief Judge, MURRAH, Circuit Judge, and RICE, District Judge.

PHILLIPS, Chief Judge.

Amerada Petroleum Corporation[1] brought this action against Burline, seeking a judgment requiring Burline to convey to Amerada five mineral interests which he had acquired in the Williston Basin in North Dakota, while an employee of Amerada. From an adverse judgment Amerada has appealed.

The findings of the trial court are supported by substantial evidence, are not clearly erroneous, and are therefore binding on this court.[2]

The facts, as reflected by such findings, follow:

For many years prior to the institution of the action, Amerada was and still

---

1. Hereinafter called Amerada.

2. Reconstruction Finance Corp. v. Cody Finance Co., 10 Cir., 214 F.2d 695; Blue Bell Co. v. Frontier Refining Co., 10 Cir., 213 F.2d 354; J. P. (Bum) Gibbins, Inc., v. Utah Home Fire Ins. Co., 10 Cir., 202 F.2d 469.

is engaged in the oil and gas business and in the purchasing, holding and developing of oil and gas leases, mineral interests and royalty interests in land, and in the producing of minerals therefrom. From time to time Amerada purchased mineral or royalty interests in lands on which it held oil and gas leases.

In 1947, Amerada first became interested in acquiring oil and gas leases in the Williston Basin, which includes Williams, Mountrail and McKenzie Counties, North Dakota. It first acquired by assignment a block of approximately 44,-000 acres of leases in the Williston Basin. It continued to acquire leases in that area and by October 1, 1951, had acquired approximately 300,000 acres of leases over an area from 12 to 14 miles in width and some 65 miles in length. The block of leases extended in a northerly and southerly direction. All or a greater portion of these leases had been placed of record by Amerada by October 1, 1951. Thereafter, Amerada continued to acquire leases and at the time of the institution of the instant action, had acquired leases on approximately 500,000 acres of land in the Williston Basin.

Amerada made geological and geophysical investigations leading to the preparation of data concerning the features of the area and the possibility of producing oil and gas therefrom, and by October, 1951, had expended approximately $1,000,000 in acquiring such data.

In 1928, Amerada adopted a rule prohibiting its officers and employees from purchasing or dealing in oil or gas mineral interests, directly or indirectly. On January 1, 1950, Amerada amended its 1928 rule, and the pertinent provisions of the rule, as amended, read:

"Officers and employees of Amerada Petroleum Corporation and its subsidiaries are prohibited (and have been since 1928) from purchasing or dealing in oil or gas mineral interests of any kind, either directly or indirectly. Any purchase or other transaction in violation of this rule shall be cause for dismissal, and at the election of the Company will be considered to be in trust for the Company, which reserves the right to recover any interest so acquired. All officers and employees who continue in the employ of the Company will be deemed to have agreed to this rule. Any purchase or other transaction by or through a former employee based on confidential information of the Company or its subsidiaries will likewise, at the election of the Company, be considered to be in trust for the Company, and it will be the policy of the Company to recover any interest so acquired."

Burline knew of the promulgation of the rule, as amended. He did not, either in writing or orally, agree to the rule. However, he did acquiesce in it.

At all times here material, Burline was a full-time employee of Amerada, but he was not employed for any definite term or period of time.

In October, 1951, when Burline was Assistant Superintendent of Production for Amerada, he acquired five royalty interests in Williams and Mountrail Counties, North Dakota, covering approximately an undivided 54 acres interest in some 800 acres, at a cost of $5,000. Title to these royalty interests was taken in the name of Morris D. Meyer, Trustee. Meyer executed a declaration of trust, dated December 18, 1951, but not recorded until February 28, 1953, by the terms of which Meyer held a one-third interest in trust for Ralph H. McVay, who was Burline's son-in-law. Meyer conveyed this interest to McVay on December 27, 1951, and McVay in turn conveyed it to Burline on March 31, 1952. The last-mentioned conveyances were recorded in July or August, 1953.

Amerada's operations in the Williston Basin were under Burline's jurisdiction and supervision as Assistant Superintendent of Production. He was charged with the duty and responsibility of supervising the drilling of wells, the test-

ing and completion of wells, the producing of oil and gas therefrom, and the providing of services and facilities in connection therewith. He was not authorized or employed to buy leases or mineral interests for Amerada, nor to compile, interpret, or make use of geological or geophysical data or information. Geological or geophysical data or information obtained by Amerada did not come into Burline's possession in the performance of his duties as Assistant Superintendent of Production.

Burline came into possession of an ownership map in the spring of 1951, which was furnished him by Amerada, and which showed the ownership of Amerada's oil and gas leases, together with their expiration dates. Such leases were located in Williams and Mountrail Counties, North Dakota. The map was used by Burline only in connection with his duties as Assistant Superintendent of Production. It showed no geological or geophysical data. Ownership maps showing Amerada's holdings in the Beaver Lodge area were readily available to the general public, and such ownership maps were offered and sold to the general public from and after July, 1950.

At the time Burline bought the mineral interests involved in this action, Amerada was in the process of drilling two wells in the same area. The first drilling was undertaken on what is known as the Iverson No. 1 well in the Beaver Lodge area. The second well commenced was the Baaken No. 1 well in the Tioga area. The wells were approximately 12 miles apart. Of the mineral interests purchased by Burline, one was four miles east of the Iverson well and was admittedly of little or no value. The closest of the remaining interests acquired by Burline were five miles north of the Baaken well. Four of the five tracts in which Burline acquired mineral interests were under lease to Amerada. Amerada has drilled wells on some of the tracts acquired by Burline and is producing oil therefrom. With one exception, the tracts are shown by

Amerada's contour map to be favorably located for the production of oil.

While the Iverson and Baaken wells were being drilled, Amerada released general information and data to the newspapers in North Dakota. Many of the newspaper articles were introduced in evidence at the trial and showed the result of drill stem and hydrostatic tests, where different formations were encountered, the depth at which the pipe was set, and where the pipe was perforated. Core samples were displayed by employees and agents of Amerada and explained and interpreted by geologists of Amerada to the general public.

Burline did come into possession of information disclosing the result of a core analysis test, two flow tests that were made in May, 1951, and the result of a bottom hole pressure test relating to the wells referred to above. However, the core analysis was unfavorable and indicated the Iverson well would not produce sufficient oil to be considered a commercial well. The flow tests and bottom hole pressure tests would be of little value to a purchaser of mineral interests and the wells on which such tests were made were so far removed from the interests acquired by Burline as to furnish little, if any, information of value to him.

Burline did not obtain or use secret or confidential data or information belonging to Amerada in acquiring the mineral interests involved herein. He did not select the specific royalty properties to be purchased, but instructed Meyer to invest $5,000 in mineral interests in the general area, and Burline did not know the exact location of such interests until they had been purchased by Meyer.

The area in which the royalties involved were purchased was located in what is known generally in the oil industry as "wild cat territory."

Amerada had no opportunity to purchase the mineral interests acquired by Meyer and later by Burline. It did not attempt to purchase, nor did it desire to

purchase such mineral interests. In the entire area Amerada acquired only 851.-92 acres of royalty interests.

Amerada first discovered Burline's acquisition of such mineral interests shortly before the institution of this action and demanded that Burline convey such interests to it. Burline refused.

In his answer, Burline admitted that he was in the employ of Amerada from March 15, 1923, until he resigned his position on March 31, 1953, and admitted that the amended rule was delivered to him on or about January 1, 1950. He denied receiving or using any secret or confidential geological or geophysical information concerning oil or gas properties owned by Amerada. He further denied that the amended rule was ever accepted by him, orally or in writing. He further alleged that insofar as such rule attempted to create a contract for the creation of a trust, it was void by reason of the provisions of the applicable Oklahoma statutes of frauds.

■ An express trust in land created by an oral agreement is unenforceable under the Oklahoma statute of frauds and statute of uses and trusts.[3] Likewise, an agreement to create a trust in land must be in writing to be enforceable. The memorandum must be a complete contract and no part of it can rest in parol.[4] The memorandum must also be signed by the party against whom the trust is sought to be enforced.

■ Burline did not waive the statute of frauds. While he admitted the existence of the rule and his knowledge of it, he specifically set up and pleaded the statute of frauds in his answer and in no wise relied on the rule.[5]

■ The employer-employee relationship between Amerada and Burline did not make the latter a fiduciary. Its character was not such as would give rise to a fiduciary relationship. Burline was an ordinary employee, who performed specific and limited services as Assistant Superintendent of Production. As such employee, he did not buy leases or mineral interests, or compile, interpret, or use geological or geophysical data for Amerada. The rule did not create such a relationship. It merely added an additional contractual obligation. Burline was bound by it contractually, but not as a fiduciary.

■ The mere violation of a contractual, as distinguished from a fiduciary obligation, will not give rise to a constructive trust.[6]

■■ The violation of an oral agreement, absent a fiduciary relationship or the element of positive fraud, does not give rise to a trust ex maleficio.[7] Here, there was no positive fraud or inequitable conduct on the part of Burline.

Amerada had no interest, actual or in expectancy, in the mineral interests acquired by Burline. His acquisition of the mineral interests in no wise hindered or defeated the plans and purposes of Amerada in the area or the carrying on of the acquisition and development of mineral leases and interests by it. Neither his employment, nor his relationship to Amerada, imposed any duty on him to acquire the mineral interests for Amerada.

Burline did not acquire or use confidential information belonging to Amerada in connection with the purchase of such mineral interests. His duties as Amerada's employee did not embrace the obtaining, interpreting, or using of geological or geophysical information. Those facts distinguish the instant case

---

3. 15 O.S.A. § 136; 60 O.S.A. § 136; Adams v. Adams, 208 Okl. 378, 256 P.2d 458, 462.

4. Garrett v. Gerard, 10 Cir., 156 F.2d 227, 229.

5. Render v. Lillard, 61 Okl. 206, 160 P. 705, L.R.A.1917B, 1061; Harn v. Patterson, 58 Okl. 694, 160 P. 924.

6. 54 Am.Jur. § 221, p. 171; 54 Am.Jur. § 231, p. 177.

7. Reed v. Peck & Hills Furniture Co., 93 Okl. 212, 220 P. 900, 903; Jones v. Jones, 194 Okl. 228, 148 P.2d 989, 991.

from Pratt v. Shell Pet. Corp., 10 Cir., 100 F.2d 833; Hunter v. Shell Oil Co., 5 Cir., 198 F.2d 485, and Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303.

Affirmed.