285 F.2d 939
 FANDERLIK-LOCKE CO., a corporation, and Great American Indemnity Company, a corporation, Appellants,
v.
UNITED STATES of America, for the Use of M. B. MORGAN, doing business as M. B. Morgan, Painting Contractor; and New Amsterdam Casualty Company, Appellees.
 No. 6144.
 United States Court of Appeals Tenth Circuit.
 November 30, 1960.
 Rehearing Denied December 31, 1960.
 
 David R. Gallagher, of McAtee, Toulouse, Marchiondo, Ruud & Gallagher, Albuquerque, N. M., for appellants.
 W. A. Sloan, of Rodey, Dickason, Sloan, Akin & Robb, and John P. Eastham, Albuquerque, N. M., for appellees.
 Before BRATTON, HUXMAN and PICKETT, Circuit Judges.
 PICKETT, Circuit Judge.
 
 
 1
 This is a Miller Act case, 40 U.S.C.A. § 270a, et seq., in which a subcontractor[1] seeks to recover, from a prime contractor and its bondsman, the value of labor performed and materials installed in addition to that provided for in the subcontract. It was alleged that, during the performance of the subcontract, required labor and materials were furnished, together with extras and additional work, at the request of the prime contractor, to the aggregate amount of $183,259.20; that the subcontractor had received $53,371; and that the balance due was $129,888.20. The court found that there was due and owing to the subcontractor the sum of $110,713.60, for the performance of the subcontract and for additions and extras furnished at the request of the prime contractor. Judgment was entered accordingly, together with interest. Upon consideration of an appeal, we reversed the judgment upon the ground that the subcontractor had not exhausted its administrative remedies as required by the "disputes clause" in the prime contract. We have reconsidered this question on rehearing, and the former opinion is hereby withdrawn.
 
 
 2
 Fanderlik entered into a contract with the United States wherein it agreed to construct 175 dwelling units at Clovis Air Force Base in Curry County, New Mexico. As required by the Miller Act, Fanderlik delivered to the United States a payment bond, executed by Grand American Indemnity Company, which guaranteed the payment of all sums due to persons supplying labor and materials in the performance of the requirements of the contract. Thereafter, for a consideration of $63,630, a subcontract was awarded to the plaintiff, M. B. Morgan, d/b/a M. B. Morgan, Painting Contractor, wherein Morgan agreed to furnish all labor, materials and equipment necessary to complete the painting requirements of the prime contract. During the performance of the subcontract, there were failures of paint which had been applied to both interior and exterior surfaces and all of the surfaces upon which the paint failed were repainted by Morgan upon the demand of Fanderlik and the architects supervising the job. There was also considerable repainting required because of storm damage and for other reasons. Morgan submitted claims to Fanderlik for this additional work.
 
 
 3
 The prime contract was the standard form of government construction contract in general use at the time of its execution. Section 6 of the general provisions thereof, states:
 
 
 4
 "Except as otherwise provided in this contract, any dispute concerning a question of fact arising under this contract which is not disposed of by agreement shall be decided by the Contracting Officer, who shall reduce his decision to writing and mail or otherwise furnish a copy thereof to the Contractor. Within 30 days from the date of receipt of such copy, the Contractor may appeal by mailing or otherwise furnishing to the Contracting Officer a written appeal addressed to the head of the department, and the decision of the head of the department or his duly authorized representatives for the hearings of such appeals shall, unless determined by a court of competent jurisdiction to have been fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith, be final and conclusive: Provided, That, if no such appeal to the head of the department is taken, the decision of the Contracting Officer shall be final and conclusive * * *."
 
 
 5
 Upon receipt of Morgan's claims, the prime contractor, following the procedure of Section 6, submitted corresponding claims to the Contracting Officer at Clovis Air Force Base. They were all denied by the Contracting Officer, and, at the time of the trial, an appeal was pending before the Board of Contract Appeals of the Air Force. The Fanderlik claims to the Contracting Officer included those upon which recovery is sought in this action.
 
 
 6
 The subcontract provided that the subcontractor should furnish material and perform labor in accordance with the general conditions of the contract between the owner and the contractor and "in accordance with the Drawings and the Specifications attached hereto which form a part of a Contract between the Contractor and the Owner * * * and hereby become a part of this Contract." The parties to the subcontract agreed "to be bound by the terms of this Agreement, the A.I.A. General Conditions attached, the drawings and specifications attached as far as apprehensible to this subcontract * * *." It was further provided that the subcontractor should be bound to the contractor "by the terms of the Agreement, General Conditions, Drawings and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the Owner."
 
 
 7
 It is contended that by these references, Section 6 of the general provisions of the prime contract was incorporated in the subcontract, and that a suit under the Miller Act cannot be maintained by the subcontractor until there is a final determination of the claims submitted under Section 6. While we express no opinion as to the right of the parties to enter into an agreement which might circumvent the Miller Act, we hold that it was not the intention of the parties to the subcontract that the subcontractor was required to comply with the provisions of Section 6 before it could maintain an action under the Miller Act.
 
 
 8
 The purpose of the Miller Act is to provide security for those who furnish labor and material in the performance of government contracts, and a liberal construction should be given the Act to accomplish this purpose. United States for Benefit of Sherman v. Carter, 353 U.S. 210, 77 S.Ct. 793, 1 L.Ed. 2d 776; St. Paul-Mercury Indem. Co. v. United States, 10 Cir., 238 F.2d 917; Fourt v. United States, 10 Cir., 235 F.2d 433; Commercial Standard Ins. Co. v. United States, 10 Cir., 213 F.2d 106. The benefits of the Act are not intended for the prime contractor who is required by the Act to furnish a bond to effectuate its provisions. If a prime contractor is dissatisfied with the administrative disposition of a claim submitted under the "disputes clause" of the prime contract, it may seek a remedy in the Court of Claims. The liability of the United States is to the prime contractor, and the "disputes clause" provides only for administrative consideration of claims made by the prime contractor.
 
 
 9
 There is no procedure by which the claim of a subcontractor can be presented against the United States except as it may become a claim of the prime contractor, since there is no contract, express or implied, between the subcontractor and the government. United States v. Blair, 321 U.S. 730, 737, 64 S.Ct. 820, 88 L.Ed. 1039. The subcontractor has no standing before the Contracting Officer or the Board of Contract Appeals, and no provision is made for the hearing of disputes between a prime contractor and a subcontractor. The remedy for one seeking to recover for labor and materials furnished on a government contract is under the Miller Act, and ordinarily the fact that a prime contractor has a claim for the same amounts pending under the "disputes clause" of the prime contract, does not affect Miller Act cases.[2] It appears that, as in this case, when a subcontractor's claim was being litigated, the administrative proceeding pertaining to the corresponding claim made by the prime contractor would, in many instances, be delayed until there was a determination of the prime contractor's liability. If the subcontractor failed to sustain his claim in a Miller Act case, there would be no basis for the prime contractor's claim then pending before the Contracting Officer or the Board of Contract Appeals.
 
 
 10
 Actions under the Miller Act shall be in the name of the United States, for the use of the person suing, in the United States District Court for any district in which the contract was to be performed and executed, regardless of the amount in controversy. 40 U.S.C.A. § 270b(b). The books are replete with cases brought under this Act. Without exception they have been tried in the United States District Court as any other action for money, and many of them have been tried to a jury. See e. g., Nolan Bros. v. United States, 10 Cir., 266 F.2d 143; Indemnity Ins. Co. of North America v. Browning-Ferris Mach. Co., 5 Cir., 227 F.2d 804; Dow v. United States, 10 Cir., 154 F.2d 707. If Morgan is limited to the presentation of his claims as provided for in the "disputes clause" of the prime contract, he has surrendered his right to the benefits of the Miller Act provisions. The findings of the administrative authorities as to the amount he is entitled to recover would be conclusive, unless the court determined them to be "fraudulent, arbitrary, capricious, or so grossly erroneous as necessarily to imply bad faith." See 41 U.S.C.A. § 321. An agreement should not be construed to bring about such a result unless it be "manifest by plain language" of the contract. United States v. Moorman, 338 U.S. 457, 462, 70 S.Ct. 288, 94 L.Ed. 256; Mercantile Trust Co. v. Hensey, 205 U.S. 298, 309, 27 S.Ct. 535, 51 L.Ed. 811. The language of the subcontract manifests no such intention.[3] The subcontract references are to the "general conditions" of the prime contract not the "general provisions," and they relate generally to performance of the subcontract according to specifications, not to the settlement of disputes, or the subcontractor's right to sue under the Miller Act.
 
 
 11
 This brings us to the merits of the case. It is admitted that there is due on the subcontract, and for certain extras, the sum of $14,533.76. This appeal involves the allowance of the remaining $96,179.84.[4] It is the contention of Fanderlik that the agreement of the parties is clearly expressed in the subcontract, and that the allowance of the disputed items resulted from the failure of the trial court to enforce the obligations of that contract. In other words, with the exception of the admitted extras, it is contended that the subcontractor did nothing more than what was required of him by the contract. The subcontractor contends that the trial court's findings to the contrary are supported by substantial evidence and are not clearly erroneous. We have held, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., in a number of Miller Act cases tried to the court without a jury, that findings of fact will not be disturbed on appeal if they are sustained by the evidence and are not clearly erroneous. E. g., Wunderlich Contracting Co. v. United States, 10 Cir., 240 F.2d 201, certiorari denied 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859; St. Paul-Mercury Indem. Co. v. United States, supra.
 
 
 12
 Shortly after the subcontract was executed a change order was made which, for an additional payment of $2,500, provided for three coats of paint on all exposed interior beams, instead of two coats of stain. The specifications called for two coats of enamel finish on all interior beams. In substance, Morgan testified that when he made his estimate of the cost of painting the interior of the buildings, it was assumed that the ceilings were without beams, and Fanderlik agreed to pay an additional $2,500 for this work, and executed the change order to this effect. Morgan also testified that the laminated beams in the ceilings of all the units were made of rough, unfinished lumber, in which there were many cracks, knot holes and extensive separation where the boards had been bolted or nailed together; and that extensive use of putty and spackle was necessary to prepare the surface for painting; he stated that because of this condition, it was agreed between the parties and the architects that a flat paint should be used instead of enamel but that the flat paint did not work out because of the putty and spackle which was visible through the paint.
 
 
 13
 Early in the project, the prime contractor constructed a model, or pilot house, which was completely finished, including all painting. The trial court found that the model house was to serve as a "test house" for all future work on the project. After a test in the model house the parties agreed to use an exterior alkyd luminal paint on the beams. This "worked out fine" until warm weather caused the sap, or resin, in the beams to show through the luminal. When this occurred, at the direction of Fanderlik all the beams were repainted with an enamel paint, but from 60 to 75 percent of the beams had already been painted with luminal and all of the 175 units received an extra coat of paint.
 
 
 14
 There was evidence that the total cost of the additional painting of the interior beams was $5,633.25. In addition to the aforesaid amount, the court allowed the recovery of $1,666.67 which apparently was two-thirds of the $2,500 provided in the change order for the painting of the interior beams. There is evidence in the record to support the allowance of these items and they were properly allowed.
 
 
 15
 The specifications required one coat of primer and one coat of alkyd flat paint on all exterior beams and woodwork. The trial court found that the exterior painting performed by the subcontractor met the specifications, and that a later failure of the paint was not "due to defects in material or workmanship" supplied by the subcontractor. The court also found that Fanderlik directed the subcontractor, in writing, to scrape all the exterior painted surfaces and repaint them, the reasonable cost of which was $41,672.75. It is conceded that the paint first used was equal to the specifications, and there was substantial evidence to sustain the finding that the failure was not caused by its improper application. Morgan testified that the failure resulted from the use of a poor grade of lumber which was specified for the job and that under written instructions, the exterior of all the buildings was repainted by him.[5]
 
 
 16
 There was expert testimony that the paint was equal to that specified, and that the failure was due to inadequate specifications, and excess moisture in a low-quality wood. It is significant that within a short time the second painting also failed in the same manner as the first, but it was not repainted by the subcontractor. The first exterior painting of the buildings having been performed as required by the subcontract and specifications, the work of removing it and repainting the surfaces was not a condition of the subcontract, but additional work for which the prime contractor was responsible. United States for Use of Ardmore Concrete Material Company v. Williams, 10 Cir., 240 F.2d 561. The evidence is adequate to sustain the allowance of this item.
 
 
 17
 The specifications provided for two coats of paint, the second to be semigloss enamel, on the interior trim and doors. In the model house, Fanderlik and the architects determined that an exterior flat paint, rather than the specified semi-gloss enamel, should be used. Thereafter the subcontractor, with the knowledge of Fanderlik and the architects, proceeded to paint the interior trim and doors in the same manner as in the model house. After all of the 175 units had been completed, the subcontractor was instructed, in writing, to proceed to repaint all of the interior trim and doors with enamel paint. The trial court concluded that the subcontractor had been authorized to paint the interior trim and doors in the same manner as in the model house, and that compliance with the demand to repaint with enamel required additional work and material, for which the subcontractor was entitled to recover a reasonable amount, in the sum of $12,815.17. No serious contention is made that the evidence does not support this finding.
 
 
 18
 During the course of the construction of the project, walls of different houses which had been painted by Morgan were damaged by other workmen. Fanderlik requested that these be repainted by Morgan. The trial court found that "This repainting was in no way caused by any defects of material or workmanship by Use-Plaintiff. All of such work was done at the request of Fanderlik-Locke Co. since the inspectors would not accept the job until such work was done." The evidence was uncontradicted that the reasonable value of this work was $4,785.55, and that amount was properly allowed.
 
 
 19
 The foregoing claims are not for items caused by a breach of the subcontract by Morgan, but they are for the reasonable value of labor and materials which were furnished in addition to that required by the contract. The recovery of a subcontractor is limited to that of his contract if he furnishes only labor and material necessary to comply therewith, but this is not that kind of a case. Here, the subcontractor performed his contract according to the specifications, and agreed changes, and after this was accomplished, upon instructions of the prime contractor who received the benefit thereof, he did additional work, in most instances with the knowledge of and instruction by the architects overseeing the job for the government. For this he is entitled to recover the reasonable value of the additional services and materials.[6] Wunderlich Contracting Co. v. United States, supra; St. Paul-Mercury Indem. Co. v. United States, supra; Southern Painting Co. of Tenn. v. United States, 10 Cir., 222 F.2d 431. Where, at the request of the prime contractor, labor and material is furnished by a subcontractor which is in addition to that required in the subcontract, there is an implied promise to pay the reasonable value therefor. We agree with the conclusion of the trial court that: "With respect to all of the additional work required of the Use-Plaintiff hereinabove referred to in the previous conclusions, the conduct of Fanderlik-Locke Co. (a) amounted to a waiver of the requirements of the contract respecting the method and time of change orders, or (b) by its directions for re-performance of work rather than true additions to the work made said requirements inapplicable thereto." We sustained findings in favor of the subcontractor under somewhat similar facts in Wunderlich Contracting Co. v. United States, supra,[7] and United States v. Williams, supra. See also Continental Cas. Co. v. Schaefer, 9 Cir., 173 F.2d 5, certiorari denied 337 U.S. 940, 69 S.Ct. 1517, 93 L.Ed. 1745; John A. Johnson & Sons v. United States, 4 Cir., 153 F.2d 534, certiorari denied 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636; Ross Engineering Co. v. Pace, 4 Cir., 153 F.2d 35.
 
 
 20
 Finally it is contended by Fanderlik that the court erred in allowing recovery on two claims arising out of repainting made necessary because of damage caused by the elements. One of these claims is for weather damage in the amount of $25,612.76, caused by dust and water throughout the course of the construction. The other claim of $3,992.89 is for water damage to interior painting attributable to a storm which occurred on July 20, 1956. There was evidence that this interior damage resulted from inadequate construction of the houses, and the trial court found the damage was not due to any fault of Morgan. At the trial, Morgan testified that in nearly all instances he told Fanderlik he expected to be paid for the additional work. He further stated that he was told by the contractor that he would be paid.[8] With respect to the interior storm damage the parties agreed upon the rate of 20¢ per square foot for repainting the damaged surfaces, which agreement was a recognition that this was extra work. Barnard-Curtiss Co. v. United States, 10 Cir., 257 F.2d 565, certiorari denied 358 U.S. 906, 79 S.Ct. 230, 3 L.Ed.2d 227. The claim for $3,992.89 was properly allowed.
 
 
 21
 With respect to the other weather damage, title to the paint passed to Fanderlik under the doctrine of accession[9] at the time the paint was applied. Therefore any responsibility on the part of Morgan to absorb the loss caused by the weather damage must be found in the express terms of the subcontract. In subcontracts of this kind the risk of loss must be borne by the prime contractor unless there is a clear provision in the contract which shifts the risk of loss to the subcontractor. Fanderlik relies upon Section 7 of the subcontract which provides, in part, as follows:
 
 
 22
 "In addition, the Subcontractor will insure the works to cover his interest in the same from time to time and for any loss of the Subcontractor by fire, earth settlement, earthquake, theft, embezzlement, riot, or any other cause whatsoever. The Subcontractor, upon request, shall exhibit said insurance policies to Contractor for its examination and approval, or furnish a Certificate of Insurance satisfactory to Contractor. The Contractor reserves the right to protect the works, at its option, by insurance, to cover its interest when payments have been made to the Subcontractor, or otherwise."
 
 
 23
 In asserting that the responsibility was Morgan's, Fanderlik refers only to the first sentence of the quoted language. It is, however, the rule that the intention of the parties to a contract should be deduced from the contract as a whole, rather than from a specific provision. United States v. Essley, 10 Cir., 284 F.2d 518, and cases cited therein. Upon examining all of the relevant language in Section 7, it appears that the last sentence in the quoted language gave to Fanderlik an option to insure the works "when payments have been made to the Subcontractor, or otherwise." Taking the two sentences together, it seems clear that the parties intended that at some point, the burden of insuring the works would be assumed by Fanderlik. This court has frequently stated that where the parties to a contract have accorded it a practical construction by their conduct, this construction will be given substantial weight in determining the proper interpretation, particularly if the conduct manifesting their construction occurred prior to any controversy. E. g., United States v. Luther, 10 Cir., 225 F.2d 499, certiorari denied 350 U.S. 947, 76 S.Ct. 321, 100 L.Ed. 825; Saulsbury Oil Co. v. Phillips Petroleum Co., 10 Cir., 142 F.2d 27; Lackey v. Ohio Oil Co., 10 Cir., 138 F.2d 449; Commercial Standard Ins. Co. v. Remer, 10 Cir., 119 F.2d 66. Fanderlik's statements to Morgan that he would be paid for the repainting, and its indication that it proposed to submit claims to its insurance company, clearly indicate that, so far as Fanderlik was concerned, whatever events were contemplated as the ones upon the occurrence of which it would insure had already happened at the time that the weather damage was inflicted. Therefore, this amount also is allowable to Morgan as additional work done outside the subcontract. Additionally, the same portion of the record can be interpreted as revealing an agreement to pay for the work. This would perhaps of itself be sufficient to justify the allowance of this claim. Barnard-Curtiss Co. v. United States, supra.
 
 
 24
 In addition to the claims themselves, Fanderlik disputes the interest awarded by the trial court of 6% on the sum of $18,526.65 from August 17, 1956. The $18,526.65 is composed of $10,259, the balance admittedly due on the subcontract, $4,533.76, the amount of the admitted extras due under written change orders, and $3,992.89, which was the amount due for the repainting necessitated by the storm damage of July 20, 1956. In New Mexico interest is allowable on an unliquidated claim which can be calculated, even though the claim itself is disputed. Anderson-Prichard Oil Corp. v. Parker, 10 Cir., 245 F.2d 831; J. P. (Bum) Gibbins, Inc. v. Utah Home Fire Ins. Co., 10 Cir., 202 F.2d 469; Woolley v. Bishop, 10 Cir., 180 F.2d 188. The first two amounts were sums certain in this instance, and the $3,992.89 was susceptible to accurate calculation. Therefore, since Morgan makes no contention that any additional interest should have been allowed, it is our conclusion that the amount of interest awarded by the trial court was correct.
 
 
 25
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The plaintiff will be referred to herein as "Morgan," or the "subcontractor;" the defendant Fanderlik-Locke Co., as "Fanderlik," or the "prime contractor."
 
 
 [2]
 John A. Johnson & Sons v. United States, 4 Cir., 153 F.2d 534, certiorari denied 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636. In Wunderlich Contracting Co. v. United States, 10 Cir., 240 F.2d 201, certiorari denied 353 U.S. 950, 77 S.Ct. 861, 1 L.Ed.2d 859, we noted that the prime contractor had submitted claims to the United States for the amounts claimed by the subcontractor, and that many of them were pending at the time of trial
 
 
 [3]
 In fact, the subcontract makes the American Institute of Architects General Conditions, Sixth Edition, Articles 1 to 44 a part of the subcontract. Article 40 of the A. I. A. General Conditions establishes an arbitration procedure, and Sections 23(m) and 23(n) of the subcontract proper pertain to the rights of the subcontractor to submit evidence and nominate an arbitrator in the event the arbitration procedure is invoked
 
 
 [4]
 The items which make up this amount are listed by the prime contractor as follows:
 Amount Awarded by
 Court and Included
 Item in Judgment 

 1. Repainting interior beams $ 5,633.25
 Change Order No. 1 1,666.67
 2. Repainting exterior beams and woodwork 41,672.75
 3. Repainting interior trim and interior doors 12,815.97
 4. Repainting due to weather damage 25,612.76
 5. Storm damage (storm of July 20, 1956) 3,992.89
 6. Repainting caused by activities of
 other crafts 4,785.55
 __________
 Total $ 96,179.84
 
 
 [5]
 Morgan testified as to the second painting as follows:
 "Q. Now, when you applied the exterior paint, did you apply it to all 175 houses? A. Yes.
 "Q. And what happened, when this paint failure occurred? Were you required to correct it, or — (Interrupted). A. I was required by a letter from Mr. — from the Fanderlik-Locke people, to take it off and scrape it clear down to the wood, where it was necessary to get all the loose paint off down to the wood, re-prime it, and re-paint it with the same materials we had used before, and we started in by having the painters removing it, and then painting it as they were there, and they objected to that. We had to completely clean and get a whole house or unit, double house done, the inspector would come by with pocket knives and things, over it, to find out if we had gotten it done right, before we could apply the paint a second time, and that is the way we proceeded to do the job."
 
 
 [6]
 In United States for Use of Ardmore Concrete Material Company v. Williams, 10 Cir., 240 F.2d 561, 563, we said:
 "In making its conclusions, the trial court stated `3 * * * Neither Ardmore nor Saxet were at liberty to disregard the written instructions of the official in charge of the work at the Ardmore Air Base regarding the change in the concrete mix. The loss which Saxet seeks to recover was not occasioned by any wrongful act of Ardmore. This loss, in my judgment, should be ultimately borne by the United States, but legally this Court is not able to render such a judgment * * *.' Since the appellant, Ardmore, had no direct contractual relationship with the United States, we agree with the trial court's dual conclusion that the ultimate loss should be in good conscience borne by, but cannot in this action be shifted to, the United States. The rule would be otherwise if Ardmore had contracted directly with the United States, and it is well-settled law that the government must respond in damages where it has thus misled one of its contractors."
 
 
 [7]
 In Wunderlich Contracting Co. v. United States, 10 Cir., 240 F.2d 201, 205, it was said:
 "A contractor who bids for work has the right to rely on the plans and specifications submitted to him for bidding purposes. The rights of the parties are to be measured by them. It is only through the plans and specifications that he can make an intelligent bid. Ryan v. Curlew Irr. & Res. Co., 36 Utah 382, 104 P. 218. Burdens other than those contemplated by the contract, may not be placed upon the contractor without additional compensation * * *."
 
 
 [8]
 This testimony was as follows:
 "Q. Go ahead, Mr. Morgan. A. (continuing) I was told when I objected, to do this work without some way of knowing that I would be paid for it, I was told by Mr. Locke, personally, when their supervision on the job couldn't answer me, that they would pay me; I got in touch by telephone with Mr. Locke, and he assured me that they were adequately covered by insurance, that all I needed to do was to get the job done, where they could sell the buildings, and that they would pay me, they would turn the Claim over to their Insurance Company and get my money for me."
 
 
 [9]
 1 Am.Jur. Accession § 2 (1938)
 
 
 
 26
 BRATTON, Circuit Judge (dissenting).
 
 
 27
 Section 6 of the prime contract concerns itself only with disputes over questions of fact. Respecting questions of that kind, it provides administrative mechanism through which adjustments may be made and errors corrected on an administrative level. The mechanism is exclusive in nature. In the absence of some clear showing that the appeal procedure is inadequate or unavailable, such procedure must be pursued and exhausted before a contractor can be heard to complain in a court. And when a contractor seeks to ignore the provisions and institute an action against the United States without having pursued and exhausted the administrative procedure, the action should be dismissed or proceedings stayed until the administrative remedy has been pursued and exhausted. United States v. Callahan Walker Construction Co., 317 U.S. 56, 63 S.Ct. 113, 87 L.Ed. 49; United States v. Blair, 321 U.S. 730, 64 S.Ct. 820, 88 L.Ed. 1039; United States v. Joseph A. Holpuch Co., 328 U.S. 234, 66 S.Ct. 1000, 90 L.Ed. 1192; United States v. Moorman, 338 U.S. 457, 70 S.Ct. 288, 94 L.Ed. 256; United States v. Wunderlich, 342 U.S. 98, 72 S.Ct. 154, 96 L.Ed. 113. Viewed in the light of these cases, it is crystal clear that if this were an action by the contractor against the United States in which recovery is sought under the prime contract, the contractor would be denied judicial relief until after the administrative procedure provided in section 6 had been fully exhausted.
 
 
 28
 This is not an action by the contractor against the United States. In substance, it is an action by the subcontractor and his assignee against the contractor and the surety on the payment bond. The subcontractor was not a party signatory to the prime contract, and the subcontract did not contain a provision identical or similar in substance to section 6 of the prime contract. But the subcontract provided that the subcontractor should furnish material and perform labor "in accordance with the General conditions of the Contract between the Owner and the Contractor and in accordance with the Drawings and the Specifications attached hereto which form a part of a Contract between the Contractor and the Owner * * * and hereby become a part of this Contract"; provided that any and all materials, labor and work furnished or performed by the subcontractor should comply with the requirements of the contractor and any governmental agency having jurisdiction thereof, and that the acceptance and approval of such agency or party was a condition precedent to the payment of any money by the contractor under the subcontract; provided that it should be the responsibility of the subcontractor to obtain the approval of the governmental agencies with respect to the material furnished and the work done under the subcontract; and provided that the contractor and the subcontractor agree "to be bound by the terms of this Agreement, the A.I.A. General Conditions attached, the drawings and specifications attached as far as apprehensible to this subcontract * * *" It further provided that the subcontractor should be bound to the contractor "by the terms of the Agreement, General Conditions, Drawings and Specifications, and to assume toward him all the obligations and responsibilities that he, by those documents, assumes toward the owner." And it further provided that the contractor should be bound to the subcontractor "by all the obligations that the Owner assumes to the Contractor under the Agreement, General Conditions, Drawings and Specifications, and by all the provisions thereof affording remedies and redress to the Contractor from the Owner." And it contained other provisions adding to the knit or interweave of the subcontract to the prime contract. When construed in their entirety, the effect of the two contracts was to integrate section 6 of the prime contract into the subcontract and make it applicable to disputes of fact between the contractor and the subcontractor. United States for Use and Benefit of Construction Products Corp. v. Bruce Construction Corp., 5 Cir., 272 F.2d 62. And since that section has application to disputes between the contractor and the subcontractor over questions of fact, the exhaustion of the administrative remedy provided in the section is a prerequisite to the right to maintain the action to final judgment.
 
 
 29
 It is my view that the judgment should be vacated and the cause remanded with directions to stay proceedings awaiting final disposition of the claim pending before the Board of Appeals for the Air Force.